# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

DANIEL LORENZ,

                Petitioner,

    v.

COLLEEN NOLL, Warden

                Respondent.

_____/

1:09-cv-01601- DLB (HC)

ORDER DENYING PETITION FOR WRIT OF
HABEAS CORPUS, DIRECTING CLERK OF
COURT TO ENTER JUDGMENT IN FAVOR
OF RESPONDENT, AND DECLINING TO
ISSUE CERTIFICATE OF APPEALABILITY

[Doc. 1]

       Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge. (Court Docs. 8, 9.)

<u>BACKGROUND</u>

       Following a jury trial in the Kern County Superior Court, Petitioner was convicted of vandalism of property worth more than $400 (Cal. Pen. Code[1] § 594(b)(1)); and willful and unlawful use of force or violence upon Aaron Blinn (§ 243(a)).  Petitioner was acquitted of the charge of making terrorists threats to Aaron Blinn (§ 422).   It was also found that Petitioner twice, after being released from custody on an earlier felony, committed an additional felony within the meaning of section 12022.1.  In addition, Petitioner had previously served two prior prison terms within the meaning of section 667.5.  Petitioner was sentenced to a total prison term of six years.

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1   Petitioner filed a timely notice of appeal.  On May 20, 2009, the California Court of

2   Appeal, Fifth Appellate District affirmed the judgment in all respects.

3   Then on July 29, 2009, the California Supreme Court denied review.

4   Petitioner filed the instant federal petition for writ of habeas corpus on September 10,

5   2009.  (Court Doc. 1.)  Respondent filed an answer to the petition on November 30, 2009, and

6   Petitioner filed a traverse on December 21, 2009.  (Court Docs. 10, 12.)

7                            STATEMENT OF FACTS

8   Aaron Blinn has lived in the same neighborhood as Petitioner for the past couple years.

9   During that time, Petitioner would frequently drive down Blinn's street at a high rate of speed

10  causing loud eruptions of noise late at night.  Petitioner revved his motorcycle right in front of

11  Blinn's home, waking up his children who were scared.  Blinn lived on the corner of the street and

12  he placed steel barriers in front of his children's window and kitchen because he was afraid

13  Petitioner would crash into his home.  Blinn had reported Petitioner's conduct to the police and

14  had asked him, albeit politely, to stop revving his motorcycle because it was scaring his children.

15  Petitioner replied, "Fuck you.  I'll do whatever I want.  You got a problem with me, we'll take it

16  out to the fields and we'll handle this."  Petitioner also stated that the police could not stop him

17  and he belonged to a motorcycle gang.

18  On September 30, 2007, just after midnight, Blinn heard Petitioner revving his motorcycle

19  outside his home, which woke up his children.  After Blinn looked outside, Petitioner drove down

20  the street at a high rate of speed, doing a "wheelie."  Blinn got in his truck and drove to

21  Petitioner's home to try to talk to him.  Just after he arrived, Blinn "saw the blinds fly open in one

22  of the windows in front of the house, and [Petitioner] jumped out of it." (RT 127.)  Petitioner

23  went to the passenger side of Blinn's truck and was screaming "Mother fucker, get out of the

24  fucking truck.  I'm going to get your fucking ass." (RT 127-128.)  He continued to scream and

25  was attempting to open the door.  He then ran to the driver's side of the truck and pushed Blinn

26  through the open window, telling him to get out of the car.  (RT 128.)  Petitioner then reached in

27  the truck and threw the driver's side door open causing it to crack and bend.  (Id.)

28  Blinn attempted to reason with Petitioner and asked him not to rev his motorcycle because

it frightened his children.  Petitioner seemed to calm down for a bit and then he exploded like a "firecracker."  (RT 131-132.)  He was screaming again and spitting on Blinn's face.  (RT 132.)  Blinn could smell alcohol on Petitioner's breath, and he told Blinn "Things are only going to get worse for your family. . . . My friends have been wanting to help me out and take care of you guys. . . . I've been holding them back. . . . Not anymore.  They're going to be able to do whatever they want. . . All I've got to do is call, and they'll be there."  (RT 132.)  Blinn was very scared by Petitioner's threats.  (RT 136.)

Blinn explained that in the past Petitioner had told him there was nothing the police department could do to stop him.  (RT 138.)  He also said he was in a motorcycle militia gang and had been shot in a gunfight.  (Id.)  After this incident, Blinn observed a group of motorcycle riders outside his home and was very scared.  (RT 147.)  Blinn did not want his wife and children in the home so they went to his father's house in Colorado.  Blinn "skipped around from house to house" and changed vehicles periodically.  (RT 149.)

Richard Smith, lives across the street from Petitioner.  (RT 185.)  On September 30, 2007, he received a phone call from Blinn in the early morning hours.  Blinn asked him to go to his home.  (RT 186.)  Smith went to Blinn's house and he was very upset.  While the two were standing outside Blinn's home, Smith observed Petitioner drove down the street at a high rate of speed and did not slow down as he turned the corner.  (RT 186-187.)

Mike Popovich, lives directly behind Aaron Blinn and their properties share a back fence.  (RT 191.)  On October 10, 2007, Popovich received a telephone call from Blinn and asked if he would help him get his family out over the back fence.  (Id.)  He helped Blinn get his wife and children over the back fence and took them to an aunt's house.  (RT 191-192.)

Manolito Sagun, owns a motorcycle and lives two houses down from Blinn.  (RT 197.)  He had conversed with him and worked on his motorcycle.  (RT 198.)  Sagun had observed Petitioner drive between 110 and 120 miles per hour in the neighborhood.  (Id.)  He also observed him doing a "wheelie."  (Id.)  On September 30, 2007, Sagun's wife and child were awakened by the excessive noise from Petitioner's motorcycle.  (RT 201.)

///

3

1    Defense Evidence

2        Justin Lopez, was 19-years-old at the time of trial, and lives two houses down from

3    Petitioner.  (RT 212-213.)  He is friends with Petitioner and knew his grandmother.  (RT 214-

4    215.)  On September 30, 2007, sometime around midnight, he was standing in his driveway with a

5    friend smoking a cigarette.  (RT 213.)  He saw Petitioner arrive home on his motorcycle and then

6    he saw Blinn arrive.  He heard yelling between Petitioner and Blinn.  (RT 215, 219, 221.)  Lopez

7    told Blinn "it's late at night.  You need to go" and Blinn told him it was none of his business.  (RT

8    220.)  He thought he heard Petitioner say "Well, if you're going to keep doing this, then you can

9    step in my front yard, but other than that you just need to leave."  (RT 221.)  He then saw Blinn

10   open the door to his truck and then say "if you're going to do something" and slammed the door.

11   (Id.)  He said that Blinn was yelling very loud.  (RT 222.)  Lopez did not see the truck's door hit

12   the blue vehicle and Petitioner remained on his lawn during the entire incident.

13   Rebuttal

14       John Chafin, is a neighbor of Petitioner.  (RT 311.)  He observed Petitioner ride his

15   motorcycle at a high rate of speed through the neighborhood.  (RT 312.)  He also observed

16   Petitioner drive around Blinn's home in a circle fashion.  (RT 314.)

17                                          DISCUSSION

18   A.    Jurisdiction

19       Relief by way of a petition for writ of habeas corpus extends to a person in custody

20   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

21   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

22   529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

23   violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

24   out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28

25   U.S.C. § 2254(a); 2241(d).

26       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

27   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

28   Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484,

                                               4

1   1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting <u>Drinkard v.</u>

2   <u>Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997),

3   *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding

4   AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed

5   after the enactment of the AEDPA and is therefore governed by its provisions.

6   B.    <u>Standard of Review</u>

7       Where a petitioner files his federal habeas petition after the effective date of the Anti-

8   Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that

9   the state court's adjudication of his claim:

10      (1) resulted in a decision that was contrary to, or involved an unreasonable
        application of, clearly established Federal law, as determined by the Supreme
11      Court of the United States; or

12      (2) resulted in a decision that was based on an unreasonable determination of the
        facts in light of the evidence presented in the State court proceeding.
13

14   28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that

15   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

16   materially indistinguishable from" a Supreme Court case, yet reaches a different result." <u>Brown v.</u>

17   <u>Payton</u>, 544 U.S. 133,  141 (2005) citing <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 405-06

18   (2000).  A state court decision will involve an "unreasonable application" of federal law only if it

19   is "objectively unreasonable." <u>Id.</u>, quoting <u>Williams</u>, 529 U.S. at 409-10; <u>Woodford v. Visciotti</u>,

20   537 U.S. 19, 24-25 (2002) (*per curiam*).  "A federal habeas court may not issue the writ simply

21   because that court concludes in its independent judgment that the relevant state-court decision

22   applied clearly established federal law erroneously or incorrectly."  <u>Lockyer</u>, at 1175 (citations

23   omitted).  "Rather, that application must be objectively unreasonable."  <u>Id.</u> (citations omitted).

24       "Factual determinations by state courts are presumed correct absent clear and convincing

25   evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

26   and based on a factual determination will not be overturned on factual grounds unless objectively

27   unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

28   <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254

apply to findings of historical or pure fact, not mixed questions of fact and law. <u>See Lambert v. Blodgett</u>, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. <u>See Ylst v. Nunnemaker</u>, 501 U.S. 979, 803 (1991). However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.    <u>Prosecutorial Misconduct - Doyle Error</u>

Petitioner contends that the prosecutor committed misconduct under <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976), by soliciting testimony regarding the invocation of his Miranda rights.

1.    <u>Factual Background</u>

Petitioner's counsel called Bakersfield Police Officer Joseph Dougherty to testify. Counsel asked him several questions relating to the officer's interview with Petitioner. (RT 266-268.)

During cross-examination, the prosecutor questioned Officer Dougherty regarding his interview:

> BY MR. HAYWARD [prosecutor]:
>
> Q. Did you attempt to - - or isn't it true you attempted to talk to him in a more in-depth way about what happened and he refused to talk to you?
>
> A. Yes, sir. I advised him of the *Miranda* issue.
>
> MR. LUKEHART [defense counsel]: Objection.
>
> THE COURT: Sustained.
>
> MR. LUKEHART: I have a motion.
>
> THE COURT: Sidebar.

(RT 269.)

//

6

After Petitioner's counsel re-opened direct examination and asked two more questions, the trial court admonished the jury as follows:

> THE COURT: Before we proceed, ladies and gentlemen of the jury, there was, in this testimony an answer made by the officer that referred to the exercise of Mr. Lorenz of his Miranda rights.  And I want you to disregard that testimony for all purposes.  You have to act as if it hasn't been given.
>
> Okay.  Anything further?
>
> MR. LUKEHART: Not at this time, Your Honor.

(RT 270.)

Later, as the jury was about to begin its deliberations, the court asked if either counsel had anything to put on the record.  The prosecutor had nothing to add, and defense counsel voiced the following concern:

> MR. LUKEHART: First of all, I want to put on the record we didn't have a chance last week when there was the Miranda reference or the reference made to my client's invocation of Miranda rights.
>
> I was quite aware that I have a right to, and the Court would seriously consider, a motion for mistrial at that point.
>
> At that point, my client instructed me and told me he was not going to consent to a mistrial at that time.  And I was - - I want to make sure that the record is clear regarding my actions.
>
> THE COURT: That's correct.
>
> And we also requested a limiting instruction, which I gave.
>
> MR. LUKEHART: That's correct.

(RT 400.)

The jury deliberated for just under three hours and returned a verdict of not guilty on count one (§ 422), and guilty on counts two (§ 594(b)(1)) and three (§ 243(a)).  (CT 128, 183.)

On March 27, 2008, Petitioner filed a motion for a new trial.  (CT 173.)  Petitioner argued that the prosecutor committed Doyle error by eliciting a reference to Miranda when examining Officer Dougherty.  (CT 175-179.)

The prosecutor filed an opposition and explained that the question to Officer Dougherty was intended to demonstrate that Petitioner did not give in depth answers and was not intended to elicit information regarding Petitioner's exercise of his Miranda rights.  Indeed, the prosecutor

stated that the answer was a "total shock and surprise" to him and no <u>Doyle</u> error occurred  (CT 184.)   The prosecutor also pointed out that Petitioner did not request a mistrial either at the time the alleged error occurred or at the end of the trial.  In any event, there was no resulting prejudice to Petitioner.  (CT 183-189.)

The trial court heard oral argument on the motion, and the following exchange took place. (RT 801.)

> THE COURT: Okay.
>
> . . . [T]he Court has read and reviewed the motion for a new trial and the opposition.
>
> I did note that there was no reply to the opposition of the district attorney.
>
> Is the - - Mr. Lukehart, are you planning on doing that?
>
> MR. LUKEHART: I'm prepared to go forward today.
>
> THE COURT: All right.
>
> All right. My tentative, after reviewing this matter, is to deny the motion for a new trial.
>
> And it's based on - - the factors are that, first of all, there was no motion for a mistrial made when the incident occurred.
>
> And - - although there was an explanation for that given at the conclusion of the trial on the record in that the - - [Petitioner] did not want to consent to a motion for a new trial at that time.
>
> Secondly, the Court immediately con - - did [sic] admonish the jury.  And it appears to the Court that the jury admonishment must have stuck or taken hold because I note that the [sic] - - there was an acquittal as to the lead charge, and that the conviction was as to the vandalism charge, which in the context of the evidence was the less disputed, in the Court's impression, of any of the evidence that was put forth the - - put before the jury.
>
> Those are my reasons, Mr. Lukehart.
>
> If you'd like to go ahead and reply to that, you can.

(RT 801-802.)

> THE COURT: Correct.
>
> MR. LUKEHART: The defendant was put in a posture by the prosecution's questioning and the officer's answers and just, parenthetically, the fact that Officer Dougherty took my client to the station, Mirandized, and my client refused to talk was not contained in any reports.

This - - I'm aware this is something that came up and just smacked me in the face when this all occurred, the whole Miranda issue.

(RT 803.)

Petitioner's counsel argued that the prosecutor's question and officer's answer placed him "in a posture where he had two constitutional rights . . . that were in conflict," the right to remain silence and the right to a speedy trial.  (RT 803.)

After hearing further argument by both counsel, the trial court ruled:

All right.  I am going to adopt my tentative.  I am going to deny the motion for a new trial.

I do think that the admonition by the Court - - and it was a single question that was asked concerning the post-arrest silence, post-*Miranda* arrest silence, that the jury followed that . . . admonition.

And the cases that I read the - - those cases where the reversals came through, and the most pointed cases were situations where the trial court allowed the questioning of a post-arrest silence and did not try to cure it with any admonition.

And, of course, I accept your argument and Mr. Hayward's argument. With regards to timing the motion for a new trial, can't - - can't [sic] ignore the fact that by not making a motion new trial the defendant, basically, had, the other option, Mr. Lukehart, and that was wait to see what the jury verdict would be.

And that appears that's another consideration after the jury verdict came in, which was very good for him on the first cause of action, first count, and then - - then take a second - - take an attack and now bring up the equivalent of a mistrial on the case because you've got an acquittal on Count 1 and try to knock out a second count.

I'm not saying that's the reasoning, but that's something that is out there as a potential reason for not asking for a motion for new trial before the jury verdict came in.

Anyway, I've stated for the record my thoughts, and I will deny that motion.

(RT 810-811.)

2.    State Appellate Court Decision

In the last reasoned state court opinion, the appellate court found the claim to be without merit and reasoned as follows:

"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' [Citations.]" (*People v. Williams* (1988) 45 Cal.3d 1268, 1318.)

*People v. Evans* (1994) 25 Cal.App.4th 358 (*Evans*) clearly explained the applicable legal principles when a claim of *Doyle* error is raised.  "*Doyle* holds that the prosecution violates due process if it uses the postarrest silence of a suspect who was given *Miranda* warnings to impeach an exculpatory explanation subsequently offered at trial."  (Id. at p. 367.)  In assessing whether *Doyle* error occurred, one must consider *Greer*, which is "the most recent treatment of *Doyle* by the United States Supreme Court."  (Ibid.)

In *Greer*, the prosecutor asked the defendant why he did not give his exculpatory story to anyone when he was arrested.  Defense counsel immediately objected and requested a mistrial.  The trial court denied the mistrial motion but immediately sustained the objection and instructed the jury to ignore the question.  The prosecutor did not mention the point during his closing argument.  In its charge to the jury, the judge instructed the jurors to disregard questions to which objections were sustained.  The Supreme Court concluded that no *Doyle* violation occurred.  It explained that a *Doyle* violation has two components.  The prosecutor must use a defendant's postarrest silence for impeachment purposes (n.5) and the trial court must permit such use.  (*Evans*, supra, 25 Cal.App.4th at p. 368.)  "The type of permission specified in *Greer* will usually take the form of overruling a defense objection, thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate."  (*Ibid*.)  Although the prosecutor in *Greer* asked an improper question, no *Doyle* error occurred because "the actions of the trial court there denied the prosecution permission to use the defendant's postarrest silence."  (*Ibid*.)

> n.5 A prosecutor's improper use can occur either by a question or by a reference in closing argument.  (*Evans*, *supra*, 25 Cal.App.4th at p. 368.)  "Accordingly, depending on the context, the use can be attacked as evidentiary error, prosecutorial misconduct, or - - as occurred in *Greer* - - both. [Citations.]"  (Id. at p. 368, fn. 6.)

This case is closely analogous to *Greer*.  Although the prosecutor elicited testimony that commented on [Petitioner's] postarrest silence, the court did not permit the People to use this testimony.  The court immediately sustained defense counsel's objection and it admonished the jury that it could not consider this testimony.  During the jury charge, it again instructed the jurors that they were not to consider testimony that had been stricken or questions to which objections were sustained.  The prosecutor did not make any reference to [Petitioner's] postarrest silence in his closing arguments.  Therefore, we agree with respondent that, "[Petitioner's] post-arrest silence was never submitted to the jury as evidence from which it could draw an impermissible inference.  Accordingly, no *Doyle* violation occurred."  (Fn. Omitted.)

Furthermore, *Doyle* error is not per se reversible; prejudice is assessed under the harmless beyond a reasonable doubt standard.  (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)  In this case, the claimed *Doyle* error is harmless.  The single impermissible question and reply were both brief.  The trial court immediately sustained defense counsel's objection and the jury was promptly admonished to disregard the improper testimony.  The court reinforced this instruction when it included instructions in the final jury charge to disregard questions to which objections have been sustained and testimony that has been stricken.  It is presumed that a jury will follow a court's instructions, including an admonition to disregard improper comments.  (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)  The impermissible question and response were not so

inflammatory that reasonable jurors would have been unable to disregard the court's instructions.  The prosecutor did not reference [Petitioner]'s postarrest silence in his closing argument.  There was strong evidence of [Petitioner]'s guilt of all three charged offenses and the favorable verdict on count one demonstrates that the jury was not inflamed against him by improper passion or prejudice.  Therefore, we find the alleged *Doyle* error to be harmless beyond a reasonable doubt.

Finally, [Petitioner] briefly contends that because he had to make a tactical choice about whether to continue with the trial or seek a mistrial, he was forced to choose between his speedy trial right and his due process right.  We reject the contention because no *Doyle* error occurred.  Therefore, [Petitioner]'s due process right was not infringed.  Furthermore, since [Petitioner] failed to support this contention with any authority, it is deemed to be without foundation and waived.  (*People v. Diaz* (1983) 140 Cal.App.3d 813, 824.)

Accordingly, we uphold denial of the new trial motion.

(Lodged Doc. No. 4, at 8-11.)

3.    Applicable Law

Post-arrest silence after Miranda warnings cannot be commented upon or used by the

prosecution.  Doyle v. Ohio, 426 U.S. 610, 611 (1976).  "[I]t would be fundamentally unfair and

a deprivation of due process to allow the arrest person's silence to be used impeach an

explanation subsequently offered at trial."  Id.  Nonetheless, the Supreme Court has found that it

is not a Doyle violation if the trial court promptly sustains a timely objection to the question

concerning post-arrest silence, instructs the jury to disregard the question, and provides a curative

jury instruction.  Greer v. Miller, 483 U.S. 756, 765-767 (1987).  If the jury is instructed to

disregard a certain question, it is presumed the jury followed that instruction and disregarded the

inadmissible evidence.  Id. at 766, n. 8.

4.    Analysis

In this instance, just as in Greer, "the fact of [Petitioner's] postarrest silence was not

submitted to the jury as evidence from which it was allowed to draw any permissible inference,

and thus no Doyle violation occurred in this case."  Greer, 483 U.S. at 765.  The trial court

immediately sustained defense counsel's objection and admonished the jury that the reference to

the Miranda issue was not to be considered by them.  It is presumed that the jury followed such

admonishment and any prejudice was ameliorated.  See Richardson v. Marsh, 481 U.S. 200, 206

(1987) (noting that "almost invariable assumption of the law that jurors follow their

instructions").

Furthermore, the prosecutor's question and Officer Doughtery's answer, when considered in the context of the entire trial, did not render it "fundamentally unfair." Greer, 483 U.S. at 766. As was the case in Greer, "the sequence of events in this case-a single question, an immediate objection, and . . . curative instructions-clearly indicates that the prosecutor's improper question did not violate [Petitioner's] due process rights. Id. at 766-767. Moreover, it was reasonable for the California Court of Appeal to conclude that, even if there was error under Doyle, it was harmless beyond a reasonable doubt in light of the evidence presented at trial. In order to demonstrate federal habeas corpus relief, this Court must determine whether the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)). In order for an error to have a "substantial and injurious effect or influence," it must have "affected the verdict." O'Neal v. McAnnich, 513 U.S. 432, 115 S.Ct. 992, (1995). Mr. Blinn provided clear testimony that Petitioner had been terrorizing him for the past two years by riding his motorcycle, three-wheeler, and truck, up and down the street at a high rate of speed at various times at night, causing loud abruptions of noise and awaking Blinn's children from their sleep. Blinn had repeatedly tried to explain to Petitioner in a reasonable and calm manner the trouble his behavior was causing to his family, and reported Petitioner's behavior on several occasions to the police. Petitioner would respond by claiming he could do whatever he pleased and if Blinn had a problem they could fight it out. Several neighbors confirmed Blinn's account that Petitioner repeatedly drove in their neighborhood at a high rate of speed causing a loud disruption. (See RT 185, 188, 197, 199-201, 309, 311-315.) On the particular occasion in question, Petitioner responded to Blinn by yelling and threatening his family's safety, causing Blinn to relocate his wife and children and take preventive measures to maintain his own physical safety. During Petitioner's rage he caused substantial damage to Petitioner's vehicle resulting in over $800 in damage. In light of this evidence, it cannot be said that the alleged Doyle error had a substantial and injurious effect on the jury's verdict, and habeas corpus relief is foreclosed.

D.    Prosecutorial Misconduct - Closing Argument

Petitioner contends the prosecutor committed misconduct during closing argument by inappropriately encouraging the jury to consider punishment as a factor in determining guilt or innocence.

In rendering a decision on the claim, the California Court of Appeal-the last reasoned decision, set forth the relevant factual background:

During the prosecutor's closing argument, he said:

"Aaron Blinn.  One guy in the neighborhood was willing to face the defendant, to stand up to the bully.  And he comes into court and he tells his story.

"And the question is: Should the defendant here be held to answer and be responsible for what he's been doing and his action, his behavior?  Or should he not?  Should we put a stamp of approval on what he's doing?  Should [we] send him a message to go back out and to what you want to do because it's your neighborhood, you own it, you do what you want?"

Defense counsel objected on an unspecified ground and the court sustained the objection.  At defense counsel's request, the court instructed the jury, "It's not the jury's - - you don't send messages.  That's not your function. [¶] Your function is to listen to the facts, listen to the law, and make a decision."

The prosecutor continued: "This is not defendant's neighborhood, the place where he feels like it because it pleases him [sic]."  Defense counsel objected on an unspecified ground.  This objection was overruled.

The prosecutor continued:

"He can act whatever way he wants, do whatever he wants, terrorize whatever way he wants.

Remember what he said to Aaron Blinn.

"Aaron Blinn first tried to talk to him about the problem and the noise and the kids.

"Do you remember what he said to him?

"Fuck you.  I'll do whatever I want to do.

"Your decision, ladies and gentlemen.  It's your case now.

"Just remember that every person in this country, every person has the right to be protected from fear and intimidation."

(Lodged Doc. No. 4, Opinion, at 11-12.)

After considering the applicable law, the appellate court found the claim to be without merit stating:

> In this case, there is nothing in the challenged remarks that the jury would have been reasonably likely to construe as a reference to sentencing. (n. 6) The court sustained defense counsel's objection to the only arguable comment by the prosecutor and instructed the jury that its job was to assess the evidence to determine guilt or innocence and not to send messages to the community. The prosecutor's remarks following this admonition were a fair comment on the evidence and reasonable inferences that could be derived from it. It is not reasonably likely that the jury would have understood the prosecutor's remarks as referencing sentencing considerations. The People's evidence showed that [Petitioner] thought he could do whatever he wanted without regard for the other people living in the area. It was this conduct that the prosecutor was referencing in his closing remarks.
>
> > n. 6 "It has been assumed for purposes of this discussion only that this prosecutorial misconduct claim was preserved for appellate review."
>
> [Petitioner]'s reliance on *People v. Mendoza* (1974) 37 Cal.App.3d 717 (*Mendoza*) is misplaced. There, defendant was charged with child molestation. The court found cumulative error from a series of improper statements by the prosecutor that unfairly aroused the jury's sympathy in favor of the child victims. These improper statements included an appeal to get the defendant off the streets and a thinly veiled comment on the defendant's failure to testify. The errors were compounded when the court gave an instruction indirectly implying that the jury could consider the defendant's failure to testify as evidence to prove an element of the charged offense. (Id. at pp. 726-727.)
>
> *Mendoza* is factually distinguishable. Here, the prosecutor did not make a series of improper statements during closing arguments and no cumulative error occurred. The court sustained defense counsel's objection to the prosecutor's sole impermissible remark during his closing arguments and the court immediately admonished the jury that its job was not to send messages but to weigh the evidence to determine guilt or innocence. Also, no *Doyle* error occurred because the court did not allow the jury to consider [Petitioner]'s post-arrest silence as proof of guilt. Therefore, *Mendoza* does not advance [Petitioner]'s argument.
>
> Accordingly, we reject [Petitioner]'s claim of prosecutorial misconduct and conclude that his constitutional due process rights were not infringed.

(Lodged Doc. No. 4 at 12-13.)

2.   Applicable Law

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (*quoting* Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)); see Bonin v. Calderon, 59 F.3d

14

1   815, 843 (9th Cir. 1995).  To constitute a due process violation, the prosecutorial misconduct

2   must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."

3   Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (*quoting* United States v.

4   Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985)).  Under this standard, a petitioner must show that

5   there is a reasonable probability that the error complained of affected the outcome of the trial -

6   i.e., that absent the alleged impropriety, the verdict probably would have been different.

7          3.    Analysis

8          The state courts' determination of this issue was not contrary to, or an unreasonable

9   application of, clearly established Supreme Court precedent.  The prosecutor's objectionable

10  comment during closing argument, when viewed in the entire context, was not prejudicial.  The

11  trial court immediately sustained defense counsel's objection and instructed the jury that they

12  were the sole judges of the evidence presented during trial.  The evidence certainly supported the

13  prosecutor's theory that Petitioner believed he could do whatever he wished in the neighborhood

14  even if it bothered other people.  Accordingly, there was no prejudicial prosecutorial misconduct

15  in this instance, and habeas corpus relief is not warranted.

16  E.   Insufficient Evidence to Support Vandalism Conviction

17         Petitioner contends there is insufficient evidence to support his conviction for felony

18  vandalism because there was no showing that he "maliciously" damaged the victim's property.

19         1.    State Court Decision

20         In the last reasoned decision of the California Court of Appeal, Petitioner's claim was

21  found to be without merit based, in pertinent part, on the following reasoning:

22              [Petitioner] contends that the evidence strongly suggests that he
        accidentally caused minor damage to the truck.  He argues it is highly unlikely that
23      he would have intentionally opened the truck's door into a car that was owned by
        his grandmother.  We are not persuaded.  This was not a mere door ding, as
24      [Petitioner] suggests.  The truck's door suffered serious damage. [Petitioner]
        opened the door so forcefully that when it hit the blue vehicle, it bent and cracked.
25      The door could not fully close because of the damage.  Repairs cost $838.36.

26              Furthermore, we do not find the fact that his grandmother owned the blue
        car to be particularly crucial.  No evidence was presented at trial suggesting that
27      [Petitioner] was concerned about his grandmother's car and would have been
        careful to avoid damaging it. [Petitioner] told Dougherty that he did not damage
28      anyone's vehicle; he did not tell the officer that he accidentally damaged the truck.

15

In any event, this merely creates a conflict in the evidence. It does not definitively prove the absence of malice. The test is not whether there is a substantial conflict in the evidence, but whether the record contains substantial evidence supporting the judgment. "'If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment will be affirmed.'" (*In re Gustavo M*. (1989) 214 Cal.App.3d 1485, 1497.)

After examining the entire record, we find that it contains substantial evidence proving that [Petitioner] acted with malice. Blinn testified that [Petitioner] jumped out of his house through a window, ran over to the passenger side of the truck, banged on the top of the passenger door and unsuccessfully tried to open it. Then he ran to the driver's side, reached in through the open window and pushed Blinn. Petitioner was screaming at Blinn to get out of the truck and threatening to "get [Blinn's] fucking ass." Then [Petitioner] unlocked the driver's side door and violently jerked it open. [Petitioner] used so much force that when the door hit the side of the blue vehicle, the door bent and cracked. It may reasonably be inferred from the testimony that [Petitioner] possessed the required mental state. Therefore, the challenge to the sufficiency of the evidence fails. [footnote omitted]

(Lodged Doc. No. 4, Opinion, at 15-16.)

2.    Applicable Law

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16. Under AEDPA, federal habeas courts apply the Jackson standard "with an additional level of deference." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005); see also Patton v. Mulliln, 425 F.3d 788, 796 (10th Cir. 2005). This Court's inquiry is whether the state court's application of Jackson was objectively reasonable. Juna H., 408 F.3d at 1275, n.13.

3.    Analysis

The state court's determination of this issue was not contrary to, or an unreasonable application of Jackson. Under California law, malice is defined as "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act." § 7. In this case, Petitioner regularly drove by Blinn's home and revved his loud motorcycle causing Blinn's young children to cry. When Blinn

went to Petitioner's home, Petitioner flew out of a window, went to the passenger side of Blinn's vehicle, and began screaming at him and trying to open the door.  Petitioner proceeded to yell, "'Mother fucker, get out of the fucking truck.  I'm going to get your fucking ass.'" (RT 128.) Blinn did nothing in response.  After Petitioner was unable to open the passenger door, he ran around the vehicle to the driver's side where Blinn was seated and continued to scream at him. Petitioner then began pushing on Blinn's left shoulder through the open window.  Petitioner continued to push Blinn further into the truck and tried to open the door.  (RT 128, 130-131.) Petitioner unlocked the door and threw it open in a violent gesture causing it to hit a blue vehicle parked on the street.  (RT 129, 134-135, 163.)  The door was bent and cracked, and ultimately cost $868.36 to repair.  (RT 129, 133-134, 317.)  There is no doubt that Petitioner acted out of anger and with the malicious intent to cause damage to the property.  The jury obviously rejected Petitioner's claim that the damage was done accidentally and this Court is bound by that determination.  Petitioner's argument is, in essence, a request that this Court reweigh the evidence, which it cannot do.  In sum, Petitioner's vandalism conviction is supported by sufficient evidence.

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      The instant petition for writ of habeas corpus is DENIED;

2.      The Clerk of Court is directed to enter judgment in favor of Respondent; and,

///
///
///
///
///
///
///
///
///

3.     The court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," i.e., when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong"); Hoffman v. Arave, 455 F.3d 926, 943 (9th Cir. 2006) (same).  In the present case, the Court finds that reasonable jurists would not find it debatable that the state courts' decision denying Petitioner's petition for writ of habeas corpus were not "objectively unreasonable."

IT IS SO ORDERED.

**Dated:**     **December 30, 2009**              **/s/ Dennis L. Beck**
                                                              UNITED STATES MAGISTRATE JUDGE